**Exhibit A**

Case 2022CV000846 Document 34 Filed 07-22-2022 Page 1 of 33

FILED
07-22-2022
George L. Christenson
Clerk of Circuit Court
2022CV000846
Honorable Michael
Aprahamian

**STATE OF WISCONSIN**　　　　**CIRCUIT COURT**　　　　**MILWAUKEE COUNTY**

CHARLES SHERCK,
6326 Barrel Race Drive
Colorado Springs, CO 80923

　　　　　　　Plaintiff,

　　　　v.

U.S. BANCORP FUND SERVICES, LLC,
615 East Michigan Street
Milwaukee, WI 53202

　　　　　　　Defendant.

Case No. 22-CV-846

Case type: 35004 Sale of Securities

<u>JURY TRIAL DEMANDED</u>

---

**AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS**

---

Plaintiff Charles Sherck ("Plaintiff") alleges the following upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, based upon an investigation conducted by counsel, which included, among other things, review of public filings with the United States Securities and Exchange Commission ("SEC"), the SEC's investigation relating to this matter and subsequent enforcement action, and review of news reports, press releases and other publicly available documents.

## I.　　INTRODUCTION

1.　　The Infinity Q Diversified Alpha Fund (the "Fund") was a mutual fund offered to the public by U.S. Bancorp Fund Services, LLC ("U.S. Bank") through the Trust for Advised Portfolios ("TAP Trust"), a trust consisting of multiple mutual funds (the "TAP Funds"), all of which are operated by U.S. Bank.

2.      While the Fund's portfolio of securities was selected by an outside portfolio manager, Infinity Q Capital Management, LLC ("Infinity Q"), U.S. Bank controlled and was responsible for all of the Fund's other operations, including valuing its securities, preparing its financial reports and filings with the SEC, and reporting the Fund's NAV to investors on a daily basis.

3.      Under contracts with the TAP Trust, U.S. Bank provided its own employees to perform the Fund's day-to-day operations and its own senior personnel to serve as the Fund's officers. U.S. Bank also assembled the group of trustees to serve as the Fund's Board, which likewise serve on the boards of the other TAP Funds. The Fund had no personnel of its own other than those employed by U.S. Bank.

4.      This action asserts federal securities law claims against U.S. Bank for causing the Fund to materially misstate in SEC filings and other public disclosures the value of its portfolio and the process pursuant to which U.S. Bank was purportedly calculating those values.

5.      From at least February 2017 through February 2021—*i.e.*, for every trading day for four years or more—U.S. Bank caused the Fund to overstate the value of its portfolio by *hundreds of millions of dollars* using valuations that were based on manipulated financial data from Infinity Q and its Chief Investment Officer, James Velissaris ("Velissaris"). U.S. Bank was responsible for implementing and overseeing the Fund's securities valuation process and represented to investors that it had procedures in place to protect against manipulation of valuation inputs by Infinity Q.

6.      Because roughly *two thirds* of the Fund's portfolio consisted solely of cash (and did not need to be valued), U.S. Bank's valuation obligations were limited to the other third of the portfolio, which consisted of derivative securities. U.S. Bank botched those valuations so badly

that the Fund's portfolio of swap instruments reported to be worth more than *half a billion dollars* was revealed by the SEC to be virtually worthless, forcing the Fund to liquidate immediately.

7. Not only were the Fund's securities enormously mispriced, but U.S. Bank misrepresented for years the process that it was supposedly conducting to verify the values of the Fund's securities, which was led by a Valuation Committee comprised solely of U.S. Bank employees.

8. The requirements of this valuation process were all but abandoned by U.S. Bank personnel, despite regular representations to the contrary in the Fund's SEC filings, leaving Infinity Q unsupervised to select and manipulate the prices for the Fund's derivative holdings.

9. While U.S. Bank repeatedly informed investors that it was verifying every valuation provided by Infinity Q, spot-checking *even a few valuations* of the Fund's holdings would have revealed that they had been extensively manipulated by Infinity Q. However, U.S. Bank was not independently verifying the valuations and instead was merely downloading prices that had been created by Infinity Q, which it then integrated directly into the Fund's published NAVs.

10. By 2020, the differences between the Fund's prices and those reported for the same securities by the Fund's counterparties (and even Infinity Q itself with respect to other accounts) began to diverge by millions of dollars, but U.S. Bank still never cross-checked the prices.

11. Infinity Q even began to report prices that were mathematically incapable of being accurate, and routinely permitted securities to expire as worthless despite having reported significant value for those securities only days earlier, but none of these abnormalities were reviewed or identified by U.S. Bank.

12.     The irregularities in the Fund's valuations, however, did draw the SEC's attention, and in May 2020 the SEC's Division of Enforcement launched an inquiry into the Fund's securities valuation practices.

13.     By November 2020, the SEC's investigation had expanded to include U.S. Bank. In December 2020 the Fund suspiciously announced that it would no longer accept new investments but continued to conceal the Fund's ongoing valuation problems.

14.     In February 2021, the SEC required the Fund to enter liquidation proceedings immediately given the extent of its valuation errors. With no prior notice to investors, on February 22, 2021, the Fund announced that it was unable to accurately calculate its NAV and would be suspending redemptions and liquidating.

15.     According to the SEC's calculations, U.S. Bank had overstated the Fund's NAV by tens of millions of dollars since at least 2017 and by over $400 million since at least 2020. Upon liquidation, the Fund's assets were approximately *$500 million* less than the NAV last calculated by U.S. Bank.

16.     While the valuation errors caused investors to overpay for their shares and ultimately caused hundreds of millions in losses, it was highly profitable to U.S. Bank: the overstatement resulted in significantly inflated asset-based fees to U.S. Bank throughout the four-year period.

17.     This class action seeks damages caused by U.S. Bank to investors pursuant to the Securities Act of 1933 (the "Securities Act"). The proposed class (the "Class") consists of all persons, excluding Defendant and its officers, directors, and affiliates, who purchased or otherwise acquired Fund shares at inflated prices from January 1, 2017 through December 30, 2020 (the "Class Period"), and were damaged thereby.

## II.    PARTIES, JURISDICTION, AND VENUE

18.    The TAP Trust is a Delaware statutory trust registered with the SEC as an investment company. The Fund is a series of the TAP Trust and operates as an open-end investment company, more commonly known as a mutual fund. The Fund's stated investment objective was to "generate positive absolute returns" that were "intended to have a low correlation to equity, fixed income and credit markets"—*i.e.*, a portfolio that would generate positive returns and would not move in sync with the market.

19.    Plaintiff is a resident of Colorado Springs, Colorado and a 23-year veteran of the U.S. Air Force, where he held multiple positions within the Strategic Air Command, Space Command, Headquarters Air Force and Joint Chiefs of Staff relating to flight, missile and space operations. Plaintiff purchased shares of the Fund directly from the Fund pursuant to the Registration Statements and other Offering Materials (defined below) and has suffered damages as a result of the federal securities law violations alleged herein.

20.    Defendant U.S. Bank is a Wisconsin limited liability company with its principal offices located at 615 East Michigan Street, Milwaukee, Wisconsin 53202. As set forth in detail below, U.S. Bank created the TAP Trust and the Fund and was responsible for virtually all non-advisory operations.

21.    This Court has personal jurisdiction over U.S. Bank because it is a domestic limited liability company with principal offices located in Wisconsin.

22.    Venue is appropriate in Milwaukee County pursuant to Wis. Stat. 801.50(2)(a) because Defendant resides in Milwaukee County.

23.    The claims asserted herein arise under and pursuant to §§ 11, 12(a) and 15 of the Securities Act.

5

24.     This Court has jurisdiction pursuant to Article 7, Section 8 of the Wisconsin Constitution and Section 22 of the Securities Act, 15 U.S.C. § 77v (providing concurrent jurisdiction to state and federal courts).

25.     This action is not removable to federal court pursuant to § 22 of the Securities Act,15 U.S.C. $ 77v, which states that "no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States."

26.     This action is not subject to a stay in favor of any other action because no action asserting claims against U.S. Bank preceded this one or otherwise creates a risk of inconsistent or duplicative adjudication of the claims and allegations because this case is the most procedurally advanced.

## III.     SUBSTANTIVE ALLEGATIONS

### A.     U.S. Bank Controls The TAP Funds' Operations

27.     U.S. Bank operates the TAP Trust as a "turn key" mutual fund service for smaller investment advisers that do not have the interest or ability to manage the governance, administrative, accounting, transfer agency, custody, legal and other services required to operate a mutual fund under U.S. regulations. Each of the TAP Funds, including the Fund, receives investment advice from a third-party investment manager, but U.S. Bank handles everything else.

28.      As it does for the other TAP Funds, U.S. Bank served as the Fund's administrator, fund accountant, transfer agent, and custodian pursuant to contracts with the TAP Trust.

29.     U.S. Bank also provided its own employees to serve in officer and trustee positions for the Fund (and the other TAP Funds), including:

- Christopher E. Kashmerick, President, Principal Executive Officer and Chairman of the Board;

- Russell B. Simon, Treasurer and Principal Financial Officer;

6

- Steven J. Jensen, Vice President, Chief Compliance Officer, and AML (Anti-Money Laundering) Officer; and

- Scott A. Resnick, Secretary.

30.     These U.S. Bank employees served in their role as Fund officers as part of the regular duties of employment at U.S. Bank. They were not separately compensated by the Fund for their service as Fund officers, but rather U.S. Bank was compensated for their service under its agreements with the TAP Trust, as discussed in further detail below. These employees served as officers for all of the TAP Funds within the TAP Trust and had no special association with any particular Fund other than in their capacity as an employee of U.S. Bank performing U.S. Bank's contractual obligations to the TAP Trust.

31.     As a result of this arrangement, U.S. Bank was both contractually and practically responsible for virtually all of the Fund's day-to-day operations, including drafting, preparing and filing the Fund's SEC filings, valuing the Fund's assets, and calculating and publishing its NAV. The Fund had no other personnel or employees available to perform these tasks and thus they were necessarily performed by U.S. Bank's personnel.

32.     As set forth below, U.S. Bank expressly agreed, through multiple contracts with the Fund, to be responsible for and execute these services on the Fund's behalf.

33.     **Fund Administration**. U.S. Bank served as the Fund's administrator since the Fund's inception pursuant to a Fund Administration Servicing Agreement dated January 1, 2014 (the "Admin Agreement").

34.     Under the Admin Agreement, U.S. Bank agreed to provide, through its own employees, a broad range of non-advisory services necessary to operate the Fund (what it described as "general fund management"), including among many other things:

7

- Provide "[o]ffice facilities (which may be in USBFS' or an affiliate's, own offices)" and "[c]orporate secretarial services";

- "Provide personnel to serve as officers of the Trust";

- "Prepare [Board] meeting agendas and resolutions," "minutes of meetings," and "reports for the Board of Trustees based on financial and administrative data";

- "Prepare and file [with the SEC] annual and semiannual shareholder reports, Form N-SAR, Form N-CSR, and Form N-Q filings and Rule 24f-2 notices. As requested by the Trust, prepare and file Form N-PX filings";

- "Coordinate the printing, filing and mailing of Prospectuses, SAI's and shareholder reports, and amendments and supplements thereto";

- "Assist Fund counsel in annual update of the Prospectus and SAI and in preparation of proxy statements as needed";

- "Monitor fidelity bond and director and officer liability coverage, and make the necessary Securities and Exchange Commission (the "SEC") filings";

- "Provide financial data required by the Prospectus and SAI" and "[p]repare financial reports for officers, shareholders, tax authorities, performance reporting companies, the Board of Trustees, the SEC, and independent accountants";

- "Supervise the Fund's custodian and fund accountants in the maintenance of the Fund's general ledger and in the preparation of the Fund's financial statements, including oversight of expense accruals and payments [and] the determination of net asset value";

- "Prepare quarterly financial statements";

- "Pay Fund expenses upon written authorization from the Trust";

- "Prepare appropriate schedules and assist independent auditors" and "[p]rovide information to the SEC and facilitate audit process";

- "Keep the Trust's governing documents, including its charter, bylaws and minute books";

- "Monitor compliance with the 1940 Act requirements," "the policies and investment limitations as set forth in its prospectus (the "Prospectus") and statement of additional information (the "SAI")," and "status as a regulated investment company under Subchapter M of the Internal Revenue Code of 1986"; and

- "Prepare and file with the appropriate state securities authorities any and all required compliance filings relating to the qualification of the securities of the Fund so as to enable the Fund to make a continuous offering of its shares in all states."

35.     U.S. Bank expressly agreed in the Admin Agreement to be liable for its own negligence and misconduct.

36.     U.S. Bank's compensation for providing services under the Admin Agreement was "bundled" with its fee for fund accounting services described below, which included an asset-based fee as well as additional fixed fees and reimbursements.

37.     **Fund Accounting.** U.S. Bank served as fund accountant for the Fund since the Fund's inception pursuant to a Fund Accounting Servicing Agreement dated January 1, 2014 ("Accounting Agreement").

38.     Under the Accounting Agreement, U.S. Bank assumed responsibility to, among other things:

- "Determine the net asset value of the Fund according to the accounting policies and procedures set forth in the Fund's current prospectus";

9

- "[O]btain prices from a pricing source approved by the [Board] and apply those prices to the portfolio positions," including fair valuation for "securities where market quotations are not readily available";

- "Calculate per share net asset value, per share net earnings, and other per share amounts reflective of Fund operations";

- "Transmit a copy of the portfolio valuation to the Fund's investment adviser daily";

- Report the Fund's "net asset value for each valuation date"; and

- "Prepare monthly reports that document the adequacy of accounting detail to support month-end ledger balances."

39.     U.S. Bank expressly agreed in the Accounting Agreement to be liable for its own negligence and misconduct.

40.     U.S. Bank was compensated by the Fund under the Accounting Agreement by an asset-based fee based on the Fund's current average daily net assets plus additional fees for providing securities pricing services and reimbursements for out-of-pocket expenses.

41.     **Chief Compliance Officer.** U.S. Bank also agreed to provide an employee to serve as the Fund's Chief Compliance Officer ("CCO"), who was responsible for designing, implementing and overseeing the Fund's compliance program under SEC Rule 38a-1.

42.     SEC Rule 38a-1 requires the Fund to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation of the Federal Securities Laws by the fund, including policies and procedures that provide for the oversight of compliance by each investment adviser, principal underwriter, administrator, and transfer agent of the fund."

43. The Fund's compliance program was intended to cover securities pricing, including fair valuation, and the Fund's CCO was responsible for "[d]aily monitoring of securities positions."

44. **<u>Other Non-Advisory Functions.</u>** In addition to serving as the Fund's administrator, fund accountant, and CCO, U.S. Bank also served as the Fund's transfer agent pursuant to a Transfer Agent Servicing Agreement ("TA Agreement") and the Fund's custodian pursuant to a Custody Agreement, each dated January 1, 2014.

45. As the Fund's transfer agent, U.S. Bank was responsible for, among other things, processing "all orders for the purchase, exchange, transfer and/or redemption of [Fund] shares" at the Fund's reported NAV.

46. As the Fund's custodian, U.S. Bank was responsible for, among other things, supplying "necessary information to . . . compute the value of the assets of the Fund," reconciling pricing discrepancies between the Fund's valuations and other reported valuations of the same securities, and obtaining "favorable opinions" from the Fund's auditors with respect to the Fund's public filings, including its registration statements and financial reports.

47. As above, U.S. Bank expressly agreed to be liable for its own negligence and misconduct in these agreements as well.

48. U.S. Bank was compensated by the Fund under the TA Agreement and Custody Agreement by asset-based and transactional fees plus reimbursements for out-of-pocket expenses.

**B.** **<u>U.S. Bank Prepared The Offering Materials On Behalf Of The Fund</u>**

49. Because the Fund offered securities to the public, it was subject to a range of disclosure and regulatory obligations under federal law. The Fund's securities were registered under the Securities Act, and until December 20, 2020, it continuously issued and redeemed shares each trading day.

50.     The Fund conducted its continuous public offerings pursuant to Registration Statements filed with the SEC annually. Under U.S. Bank's direction, the Fund filed its initial Registration Statement on September 26, 2014, and the Registration Statements in effect during the Class Period were filed on December 31, 2016, December 31, 2017, December 31, 2018 and December 31, 2019.

51.     Each of the Fund's Registration Statements included a Prospectus and a Summary Prospectus, which provide investors information about, among other things, the Fund's investment strategies, risks, and performance.

52.     Each of the Registration Statements also incorporated by reference a Statement of Additional Information ("SAI"), which provided further information about the Fund and its operations.

53.     U.S. Bank drafted the Fund's Registration Statement, including each of the Prospectus, Summary Prospectus, and SAI, and coordinated the process by which the Registration Statement was approved and filed with the SEC each year.

54.     In addition, the Fund filed Annual and Semi-Annual Shareholder Reports with the SEC every six months, which U.S. Bank drafted.

55.     The Shareholder Reports included, among other things, the Fund's financial statements, including a listing of all securities held by the Fund and their values as of the end of the reporting period (for the Annual Reports, as of the end of August; for the Semi-Annual Reports, as of the end of February), all of which were prepared by U.S. Bank. The financial statements and accompanying notes in the Fund's Shareholder Reports were incorporated by reference into the Registration Statements.

56.     The Fund's Registration Statements, including the incorporated Prospectuses, Summary Prospectuses, SAIs, and Shareholder Reports, are collectively referred to herein as the "Offering Materials."

57.     U.S. Bank was directly responsible for drafting, preparing and filing the Fund's public filings, including the Offering Materials. In order to do these things (or, in other words, to cause the Fund to do these things), U.S. Bank utilized its own employees across multiple groups. As to its own operational responsibilities, including securities valuation (as discussed below), U.S. Bank's employees were the only personnel with knowledge with respect to such operations and therefore necessarily drafted and/or provided the information necessary to make the Fund's public disclosures.

58.     In addition to drafting and preparing the Fund's public disclosures, U.S. Bank employees, Mr. Kashmerick and Mr. Simon—who were officers of the Fund that U.S. Bank contractually agreed to provide under the Admin Agreement—both signed the Fund's Registration Statements and Shareholder Reports during the Class Period.

## C.     U.S. Bank Calculated And Published The Fund's NAV

59.     The Fund, like all mutual funds, was required to publish the offering price of its shares based on its per share NAV, which was calculated by U.S. Bank every trading day. The per share NAV is the value of a pro rata share of the Fund's investment portfolio on the day of purchase.

60.     As explained in the Fund's Prospectus:

> Shares of the Fund are sold at NAV per share which is calculated as of the close of regular trading (generally, 4:00 p.m., Eastern Time) on each day that the New York Stock Exchange ("NYSE") is open for unrestricted business . . . The NAV is the value of the Fund's securities, cash and other assets, minus all expenses and liabilities (assets – liabilities = NAV). The NAV per share is determined by dividing NAV by the number of shares outstanding (NAV/# of shares = NAV per share).

13

61.     U.S. Bank was contractually responsible for accurately calculating and publishing the Fund's NAV. Accurate calculation of NAV was critical to ensure that purchasing shareholders received the correct value for their investment and that existing shareholders were not diluted.

62.     Through the Accounting Agreement, the Fund's Board delegated day-to-day responsibilities for valuation to U.S. Bank and a "Valuation Committee" consisting entirely of U.S. Bank employees.

63.     Mr. Kashmerick and Mr. Simon were members of the Fund's Valuation Committee, as was a third member, identified publicly as the Fund's Assistant Treasurer, who on information and belief also was a U.S. Bank employee.

64.     While some securities, like stocks, can be valued based on market prices, the Fund invested heavily in derivative instruments, including credit derivatives, convertible securities, futures, forwards, options and swap contracts (the "Derivative Investments"), that did not have readily obtainable market prices that could be used for purposes of the daily NAV calculation.

65.     In the absence of readily available market prices, the Fund's Derivative Investments could be valued using prices provided by an independent pricing service or they could be "fair valued," in which case they would be valued based on a good faith assessment of the amount that the Fund would receive for the securities upon a current sale.

66.     While a mutual fund's investment adviser may provide input in connection with fair valuation of securities held by a fund, such involvement gives rise to potential conflicts of interest because investment advisers may have an incentive to value fund assets improperly to increase fees, improve or smooth reported returns, or comply with the fund's investment policies and restrictions. Thus, it is important that a fund's valuation process be properly implemented and

overseen, and that any valuation inputs provided by the fund's adviser be independently verified to ensure the information reflects a good faith assessment of the actual value of the securities.

67.     The Registration Statement represented to investors that U.S. Bank and its personnel on the Valuation Committee were responsible for implementing and overseeing the Fund's valuation process, including independently verifying any valuations provided by Infinity Q. These statements indicated to investors that they would be protected by U.S. Bank from any conflict of interest on the part of Infinity Q with respect to securities valuation.

68.     As explained in the Fund's December 31, 2019 Prospectus, the Valuation Committee was supposed to review each and every valuation of the Fund's securities, and the underlying basis for the valuations, including so-called "Fair Valuation Forms":[1]

> The Board has delegated day-to-day valuation matters to a Valuation Committee that is comprised of the Trust's President, Treasurer and Assistant Treasurer and is overseen by the Trustees. The function of the Valuation Committee is to review each Adviser's valuation of securities held by any series of the Trust for which current and reliable market quotations are not readily available. Such securities are valued at their respective fair values as determined in good faith by each Adviser, and the Valuation Committee gathers and reviews Fair Valuation Forms that are completed by an Adviser to support its determinations, and which are subsequently reviewed and ratified by the Board.

69.     The December 31, 2019 Prospectus further stated that:

> When reliable market quotations are not readily available or the Fund's pricing service does not provide a valuation (or provides a valuation that in the judgment of the Adviser does not represent the security's fair value) or when, in the judgment of the Adviser, events have rendered the market value unreliable, a security or other asset is valued at its fair value as determined under procedures approved by the Board. Valuing securities at fair value is intended to ensure that the Fund is accurately priced and involves reliance on judgment. Fair value determinations are made in good faith in accordance with the procedures adopted by the Board. The Board will regularly evaluate whether the Fund's fair valuation pricing procedures continue to be appropriate in light of the specific circumstances of the Fund and the quality of prices obtained through their application by the Trust's valuation committee.

---

[1]     While this complaint quotes from the Fund's December 31, 2019 Registration Statement, the other Registration Statements effective during the Class Period contain materially identical disclosures.

15

70. The December 31, 2019 SAI further explained:

> Generally, the Fund's investments are valued at market value or, in the absence of a market value, at fair value as determined in good faith by the Fund's Adviser with oversight by the Trust's Valuation Committee pursuant to procedures approved by or under the direction of the Board.

71. U.S. Bank's employees, who were responsible for implementing and overseeing the Fund's valuation process, necessarily drafted and/or provided the information incorporated into the Fund's Offering Materials on those topics, including the foregoing representations with respect to the Valuation Committee and the process for securities valuation.

72. The foregoing representations were false and misleading because they failed to disclose that, as described in detail below: (a) the Fund's Derivative Instruments were not "valued at their respective fair values as determined in good faith"; (b) day-to-day valuation of the Derivative Instruments was essentially delegated to Infinity Q, without effective oversight by the Valuation Committee, despite the potential conflict of interest; (c) in the absence of effective oversight by the Valuation Committee, Infinity Q manipulated the pricing models and inputs used to value the Derivative Instruments, resulting unreliable and inflated valuations; (d) the Valuation Committee did not "gather[] and review[] Fair Valuation Forms . . . to support [Infinity Q's] determinations," nor were Fair Valuation Forms "subsequently reviewed and ratified by the Board"; and (e) the Valuation Committee did not implement any process to independently verify the valuation information provided by Infinity Q for the Derivative Instruments.

**D.    U.S. Bank Misrepresented Its Valuation Oversight For Years, Permitting Infinity Q To Manipulate Prices At Will**

73. Unbeknownst to investors, and contrary to the Fund's public representations (which U.S. Bank caused it to make), the Valuation Committee was not following the pricing guidelines in the Valuation Policies described above or otherwise verifying the reported prices of the Fund's Derivative Instruments. Rather, it permitted the vast majority of the Fund's Derivative Instruments

16

to be unilaterally priced by Infinity Q and its portfolio manager, Velissaris, using Bloomberg Financial's ("Bloomberg") B-Val pricing tool ("B-Val").

74. B-Val is a digital platform that estimates the prices of derivative instruments using financial "models" designed to match the structure of the instrument being priced. Because Bloomberg does not have access to the actual terms of a swap contract, the B-Val service relies on the accuracy of the inputs provided by the user to estimate how a particular instrument may trade in the market.

75. Users may select "basic" valuation models provided by B-Val with preset configurations, but also may select "custom" models that can be manipulated by the user to match the terms of specific transactions, usually as reflected by a term sheet between the counterparties, which the user manually inputs into the B-Val system.

76. After selecting a model and inputting the terms of the instrument at issue, B-Val creates a computer code that calculates the value of the position on an ongoing basis.

77. In this case, the B-Val "user" was solely Infinity Q. Infinity Q and Velissaris managed the B-Val database and exercised complete control over both the selection of the particular B-Val models used to value the Fund's Derivative Instruments and the transaction terms and other inputs used to value each instrument.

78. U.S. Bank was aware since at least 2018 that Infinity Q "use[d] models on [B-Val] to complete valuations" and had "the ability to change inputs or calibrate any of the models." Nonetheless, as the SEC would find in its investigation, Infinity Q was permitted to input and generate B-Val prices with "virtually no oversight or contemporaneous record."

79. The Valuation Committee did not require Infinity Q to support or explain any particular swap valuation, did not collect valuation worksheets supporting the prices (as was

supposed to be part of the standard valuation process), and otherwise failed to independently verify the models and inputs used in B-Val to generate prices, such as cross-checking the prices with counterparties, brokers or other market participants.

80.     Left unsupervised, Infinity Q and Velissaris embarked on a years-long scheme to hide poor performance in the Fund with inflated valuations.

81.     Velissaris made changes to the underlying valuation code of the B-Val models, modified inputs in the models that did not match the term sheets, selected inappropriate valuation models for the security as issue, and cherry picked desirable pricing factors on a security-by-security basis—all in an effort to hide losses, boost reported performance, and attract new investors to the Fund.

82.     Velissaris's unsupervised modifications to the inputs or financial models in B-Val directly affected the reported prices for the Fund's Derivative Instruments, which U.S. Bank then integrated without verification into the Fund's publicly stated NAV.

83.     The misvaluations snowballed over time, eventually resulting in hundreds of millions of dollars of fictious value by 2020, as demonstrated by the SEC's chart below:

| Month End | IQ Reported Mutual Fund NAV | Recalculated Mutual Fund NAV | Difference | Percent Overvalued |
|---|---|---|---|---|
| 3/31/2017 | $156,433,465 | $150,456,249 | ($5,977,216) | 3.97% |
| 6/30/2017 | $159,886,216 | $150,827,761 | ($9,058,455) | 6.01% |
| 9/30/2017 | $165,306,959 | $159,449,652 | ($5,857,307) | 3.67% |
| 12/31/2017 | $173,098,348 | $170,908,162 | ($2,190,187) | 1.28% |
| 3/31/2018 | $210,240,557 | $206,520,975 | ($3,719,582) | 1.80% |
| 6/30/2018 | $234,320,148 | $225,651,709 | ($8,668,439) | 3.84% |
| 9/30/2018 | $310,450,929 | $304,083,779 | ($6,367,150) | 2.09% |
| 12/31/2018 | $428,724,464 | $400,457,990 | ($28,266,474) | 7.06% |
| 3/31/2019 | $549,812,778 | $517,609,174 | ($32,203,604) | 6.22% |
| 6/30/2019 | $626,243,979 | $575,038,219 | ($51,205,759) | 8.90% |
| 9/30/2019 | $702,332,704 | $636,806,877 | ($65,525,827) | 10.29% |
| 12/31/2019 | $770,265,076 | $678,227,874 | ($92,037,201) | 13.57% |
| 3/31/2020 | $1,051,949,041 | $634,596,397 | ($417,352,644) | 65.77% |
| 6/30/2020 | $1,367,755,693 | $883,049,535 | ($484,706,158) | 54.89% |
| 9/30/2020 | $1,634,510,959 | $1,149,333,710 | ($485,177,249) | 42.21% |
| 12/31/2020 | $1,807,630,993 | $1,399,060,792 | ($408,570,201) | 29.20% |
| 2/18/2021 | $1,727,194,949 | $1,330,371,820 | ($396,823,128) | 29.83% |

84.     U.S. Bank reported these false valuations to investors through the Fund's NAV on every trading day and reaped millions of dollars in fees taken as a percentage of the Fund's fraudulent and nonexistent assets.

85.     Had the U.S. Bank provided the oversight and performed the independent verification of the securities valuations described in the Registration Statement, it would have discovered immediately that the reported values were the result of Infinity Q's fraudulent and unreliable models.

86.     For example, if U.S. Bank had attempted to independently calculate the prices of even a sampling of the Derivative Instruments using B-Val, it would have discovered Velissaris's scheme. Given the widespread and extensive manipulation of the B-Val models and inputs by Velissaris, it would have been impossible for U.S. Bank to have independently replicated the fraudulent prices reported by Velissaris.

87. Indeed, as the years passed, Infinity Q's scheme became more difficult to sustain, and Velissaris was forced to become more blatant, even resorting to valuations that were mathematically impossible. Yet, as it had in years past, U.S. Bank dutifully integrated those mathematically impossible valuations into the Fund's NAV.

88. For example, some of the Fund's swaps were priced based on so-called "volatility" factors (*i.e.*, the value of the swap moves up and down based on the level of volatility in a given market). While volatility may be low or high, it cannot be negative.

89. Nonetheless, in order to generate inflated prices for volatility swaps, Velissaris inputted negative volatility data into B-Val.

90. Any valuation professional—and especially the members of the Valuation Committee and U.S. Bank's valuation personnel, who were specifically charged with verifying the Fund's prices—could have identified this obvious inconsistency, as the SEC and other market participants ultimately did. U.S. Bank's failure to do so demonstrates that it conducted no independent analysis or verification of the prices provided by Infinity Q.

91. In addition, cross-checking merely a sample of the swap prices with the Fund's counterparties and even other investments managed by Infinity Q (as the SEC ultimately did) would have immediately identified discrepancies within the Fund's portfolio, but U.S. Bank never did so.

92. U.S. Bank also served as administrator for Infinity Q's private hedge fund (the "Private Fund"), which implemented a materially identical investment strategy. Thus, it had access to prices for the securities reported by the Fund as well as the Private Fund.

93.     In cases where the Fund and the Private Fund held the same securities, Infinity Q repeatedly reported prices for the Fund that did not match, and in some cases were greater than, the prices used in the Private Fund for the same security.

94.     For example, in 2019, the prices of a variance swap trade allocated equally to the Fund and the Private Fund diverged between the funds by over $2 million, despite that Infinity Q's compliance rules required identical securities between the funds to be priced identically.

95.     U.S. Bank, as the Private Fund's administrator, had direct access to these inconsistent prices, but neither the Valuation Committee nor any other U.S. Bank personnel cross-checked the valuations between the Fund and the Private Fund as a means of independently verifying the prices reported for the Fund's Derivative Instruments.

96.     Infinity Q also reported swap prices that blatantly deviated from the prices disclosed in the same positions by unaffiliated counterparties, which in some cases were publicly reported.

97.     Because the Fund's swap contracts typically included two parties—the Fund and the counterparty to the swap—at least two valuations were independently made with respect to the same instrument—one by the Fund (i.e., by Infinity Q) and one by the unaffiliated counterparty (and its valuation professionals).

98.     In one instance, for example, the Fund's swap positions with a single counterparty were marked at a value of over $30 million when the counterparty showed a valuation of less than $200,000.

99.     Cross-checking the Fund's reported swap prices with counterparties holding the same instrument is a straightforward means of independently verifying those prices, but U.S. Bank had no process in place to do so.

100.    Additionally, Infinity Q repeatedly made suspicious short-term changes to the value of the Fund's swap instruments, including that it reported swaps expiring as worthless despite having reported material valuations within days of the termination dates.

101.    Absent an explanation based on market conditions, the Fund's swaps prices should not routinely have been subject to drastic changes over the course of a few days before termination, and such changes should have raised flags.

102.    Given its role as the Fund's administrator and accountant—with access to all of the Fund's books and records—U.S. Bank should have been aware of these changes, but it apparently never made even a superficial investigation into the improprieties.

**E.      The Fund Shuts Down After Disclosing That The Value
Of The Derivative Investments Was Enormously Overstated**

103.    In May 2020—tipped off by the mathematically impossible valuations and the conflicting swap prices reported by the Fund's counterparties—the SEC's Division of Enforcement launched an inquiry into the Fund's valuation practices.

104.    The SEC informed Infinity Q of the Fund's pricing discrepancies when it launched the inquiry in May 2020, and Infinity Q immediately informed U.S. Bank, but U.S. Bank concealed this information from investors.

105.    On November 18, 2020, as part of its escalating investigation of the Fund's valuation practices, the SEC served an additional document subpoena on U.S. Bank. Thereafter, on December 30, 2020, the Fund unexpectedly announced that it would not accept new investments:

> Effective as of the close of business on December 31, 2020, the Infinity Q Diversified Alpha Fund (the "Infinity Q Fund") is closed to all new investment, including through dividend reinvestment, and the Infinity Q Fund's transfer agent will not accept orders for purchases of shares of the Infinity Q Fund from either current Infinity Q Fund shareholders or new investors. Current shareholders, however, may continue to redeem Infinity Q Fund

shares. If all shares of the Infinity Q Fund held in an existing account are redeemed, the shareholder's account will be closed.

106. The Fund did not explain the reason for its sudden closure, nor did it indicate that there was any issue with respect to the Fund's valuation processes or the reliability of its previously calculated NAVs.

107. On February 18, 2021, the SEC informed Infinity Q that it believed that the Fund's portfolio manager, James Velissaris, was manually adjusting certain parameters within the third-party pricing models to manipulate the fair value of certain of the Fund's swap contracts. The swap contracts at issue accounted for 18% of the Fund's $1.8 billion in assets—*i.e.* approximately $324 million—rendering the Fund's published NAVs inaccurate and misstated.

108. The following day, February 19, 2021, Infinity Q informed the Fund that it was unable to verify that the fair values previously provided for the Derivative Instruments were accurate.

109. On February 22, 2021, the Fund submitted an application to the SEC for permission to suspend redemptions of Fund shares, permitting the Fund to liquidate its portfolio and distribute its assets to current and former shareholders (the "Rule 22(e)(3) Application").

110. The Rule 22(e)(3) Application was the first public disclosure of issues or concerns relating to valuation of the Fund's portfolio securities or its previously published NAVs.

111. The Rule 22(e)(3) Application stated that the Fund's previously reported NAVs were inaccurate and that it was unable to calculate an accurate NAV:

> [B]ased on information learned by the Commission staff and shared with Infinity Q, Infinity Q informed the Fund that Infinity Q's Chief Investment Officer had been adjusting certain parameters within the third-party pricing model that affected the valuation of the Swaps. On February 19, 2021, Infinity Q informed the Fund that at such time it was unable to conclude that these adjustments were reasonable, and, further, that it was unable to verify that the values it had previously determined for the Swaps were reflective of fair value. Infinity Q also informed the Fund that it would not be able to calculate a fair value for any of the Swaps in sufficient time to calculate an accurate NAV for at least several days. Infinity Q and the Fund immediately began the effort to value these Swap positions

accurately to enable the Fund to calculate an NAV, which effort includes the retention of an independent valuation expert. However, Infinity Q and the Fund currently believe that establishing and verifying those alternative methods may take several days or weeks. Infinity Q and the Fund are also determining whether the fair values calculated for positions other than the Swaps are reliable, and the extent of the impact on historical valuations. As a result, the Fund was unable to calculate an NAV on February 19, 2021, and it is uncertain when the Fund will be able to calculate an NAV that would enable it to satisfy requests for redemptions of Fund shares.

112.    As a result, the Fund announced that it would wind down the Derivative Instruments and liquidate the Fund:

The Fund and Infinity Q believe that the best course of action for current and former shareholders of the Fund is to liquidate the Fund in a reasonable period of time, determine the extent and impact of the historical valuation errors, and return the maximum amount of proceeds to such shareholders. Relief permitting the Fund to suspend redemptions and postpone the date of payment of redemption proceeds with respect to redemption orders received but not yet paid will permit the Fund to arrive at a valuation for the Swaps and any other portfolio holdings for which current and reliable market quotations are not available, and to liquidate its holdings in an orderly manner.

113.    When the SEC granted the Rule 22(e)(3) Application, several of the counterparties to the Fund's bilateral over-the-counter ("OTC") positions issued notices of intent to terminate those positions immediately. These notices created a substantial risk that the counterparties would terminate the bilateral OTC positions involuntarily and in short order, and potentially cause the Fund to owe money to the counterparties based on prices dictated by the counterparties.

114.    As a result, the Fund was forced to liquidate its entire portfolio immediately.

115.    On February 26, the Fund's Board retained Russell Investments Implementation Services ("RIIS") to advise it with respect to the Fund's liquidation and to execute the Fund's transactions.

116.    By March 9, 2021—*i.e., in a little over a week*—RIIS had liquidated 93% of the Fund's investments. By March 19, 2021, RIIS had liquidated the entire portfolio.

117. After converting its portfolio to cash, the Fund held only $1.25 billion of the $1.73 billion in net assets last reported by the Fund—*i.e., it was short nearly $500 million or a third of the Fund*.

118. Given that the Fund held roughly $1.2 billion in cash equivalents, it appears that the Fund was able to glean less than $50 million for its entire portfolio of Derivative Instruments—a tenth of the previously stated value.

**F.    U.S. Bank Caused the Fund to Make False and Misleading Statements Regarding Its NAV and Valuation Procedures**

119. U.S. Bank prepared and caused the Fund to disseminate the misleading Offering Materials, which since at least 2017 included inaccurate NAVs for the Fund that were overstated by millions of dollars, misrepresented the oversight and valuation processes that U.S. Bank was purportedly performing for the Fund (which were entirely abandoned), and failed to disclose that U.S. Bank was permitting Infinity Q to unilaterally price securities through B-Val in a manner that U.S. Bank was incapable of verifying and was not attempting to verify.

120. Despite the representations in the Offering Materials, U.S. Bank failed to independently verify and confirm Infinity Q's valuation activities and the integrity of the fair value determinations, and failed to implement the oversight process described in the Registration Statements for the Fund's Derivative Investments. U.S. Bank and the Valuation Committee did not undertake to meaningfully review and oversee Infinity Q's valuation of Derivative Investments. Rather, they merely accepted Infinity Q's valuations, without independently confirming those valuations.

121. U.S. Bank calculated and published the Fund's NAV during the Class Period by incorporating the fraudulent fair value information without ensuring that the valuations were a good faith estimate of the price that could be obtained for the Derivative Investments. As a result,

25

U.S. Bank caused the Fund to materially misstate its NAV and the value of its portfolio of securities throughout the Class Period. While evaluation of the extent of the Fund's overstatement is ongoing, on information and belief, the Fund's NAV was misstated since at least 2017.

122. As a result, Plaintiff and other Class members purchased shares of the Fund at inflated prices during the Class Period.

123. The inaccurate NAVs calculated by U.S. Bank also were used in connection with performance reporting that U.S. Bank prepared and published in the Fund's Prospectuses and Shareholder Reports, and thus U.S. Bank presented to investors false, inaccurate and unreliable information regarding the Fund's performance.

124. In addition, U.S. Bank incorporated the fraudulent fair valuations—again without verifying their reliability—into the disclosure of portfolio holdings that it published in the Fund's Shareholder Reports, providing investors with false, inaccurate and unreliable information regarding the value of the Fund's portfolio and the individual securities comprising it.

125. U.S. Bank and its employees also caused the Fund to misstate material facts about the process used to value the Fund's portfolio securities valuation and to calculate its daily NAV and conceal the fact that Infinity Q had been left unsupervised to unilaterally price the securities.

126. The relevant portions of the Registration Statements, drafted by U.S. Bank, stated that the Valuation Committee would "review and oversee each Adviser's valuation of securities held by any series of the Trust for which current and reliable market quotations are not readily available," that the "Valuation Committee gathers and reviews Fair Valuation Forms that are completed by the Advisers to support their determinations, and which are subsequently reviewed and ratified by the Board," and that Infinity Q's valuations were subject to "oversight by the . . . Valuation Committee."

26

127. These statements were false and misleading because U.S. Bank did not implement the described process for the Fund's Derivative Investments, despite the size of those investments and their importance to the Fund's NAV.

128. The Registration Statements further stated to investors that the Fund's valuation procedures would be "regularly evaluate[d] . . . in light of the specific circumstances of the Fund and the quality of prices obtained through their application by the Trust's valuation committee." However, U.S. Bank did not review or enhance the process for overseeing the valuation of the Derivative Instruments, even as their size and importance in the portfolio increased significantly.

129. Although the Fund's Prospectus disclosed certain "Valuation Risk[s]," including that "[v]aluation may be more difficult in times of market turmoil," and "may be impacted by technological issues and/or errors by pricing services or other third party service providers," the Registration Statements failed to disclose that Infinity Q had been given complete discretion to value the Derivative Instruments without meaningful oversight—an arrangement that creates unjustified risks that were not disclosed to investors.

130. The Registration Statements likewise failed to disclose Infinity Q's resulting conflict of interest with respect to valuation of the Fund' portfolio holdings, and the risk that Infinity Q may, as a result, seek to influence the value of the Derivative Instruments for its own benefit.

**CLASS ACTION ALLEGATIONS**

131. Plaintiff brings this action as a class action under Wis. Stat. § 803.08 on behalf of a Class consisting of all persons, excluding Defendant and its officers, directors, and affiliates, who purchased or otherwise acquired Fund shares during the Class Period and were damaged thereby.

132.    This action satisfies Wis. Stat. § 803.08(1)(a) because the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Fund or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

133.    This action satisfies Wis. Stat. § 803.08(1)(b) because common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendant violated, or caused the Fund to violate, the Securities Act;

b.    whether Defendant caused the Fund to make statements to the investing public in the Registration Statements and/or Offering Materials that misrepresented material facts or concealed material facts about the business and operations of the Fund; and

c.    the extent to which members of the Class have sustained damages and the proper measure of damages.

134.    This action satisfies Wis. Stat. § 803.08(1)(c) because Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.

135.   This action satisfies Wis. Stat. § 803.08(1)(d) because Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation with sufficient resources to handle an action of this nature.

136.   This action satisfies Wis. Stat. § 803.08(2)(c) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them, and individual prosecution would risk inconsistent and varying adjudications with respect to individual class members. There will be no difficulty in the management of this action as a class action and there are no other reasons why proceeding as a class action would be undesirable.

## CAUSES OF ACTION

## COUNT I

### Violation of § 11 of the Securities Act

137.   Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

138.   U.S. Bank—through its employees that it contractually agreed to provide to the Fund pursuant to the Admin Agreement—signed and authorized the filing of the Fund's Registration Statements, including the Shareholder Reports incorporated by reference into the Registration Statements.

29

139. U.S. Bank drafted and prepared the Fund's Registration Statements, including the false and misleading disclosures concerning the procedures used to fair value the Fund's portfolio holdings and the purported role of the Valuation Committee in fair valuation determinations.

140. U.S. Bank prepared the inaccurate NAVs, which were reported in the Fund's Registration Statements and in the Shareholder Reports incorporated by reference into the Registration Statements.

141. U.S. Bank prepared the disclosures of the Fund's portfolio holdings in the Fund's Shareholder Reports incorporated by reference into the Registration Statements, which misrepresented by value of the Fund's portfolio and the securities included in it.

142. The Registration Statements, including the Shareholder Reports incorporated by reference, were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

143. U.S. Bank is strictly liable to plaintiff for the misstatements and omissions in the Registration Statements.

144. U.S. Bank did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

145. By reasons of the conduct herein alleged, U.S. Bank violated, and/or controlled a person who violated, § 11 of the Securities Act.

146. Plaintiff and the Class acquired shares of the Fund pursuant to the Registration Statements and have sustained damages as a result of the violation because the value of the shares of the Fund has declined substantially after disclosure of the misstatements and omissions.

30

Case 2022CV000846   Document 24   Filed 07-22-2022   Page 31 of 33

147. As a result of the wrongful conduct alleged herein, Plaintiff and the Class have suffered damages in an amount to be established at trial.

148. In light of the above, U.S. Bank violated § 11 of the Securities Act and is liable to Plaintiff and the Class for the damages realized in connection with their purchases of the Fund's securities.

## COUNT II

### Violation of § 15 of the Securities Act

149. Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

150. U.S. Bank controlled and provided virtually all of the personnel, systems and infrastructure necessary for the Fund to operate, including the Fund's officers and trustees, and managed and controlled the business affairs of the Fund pursuant to contracts with the Fund (or with the Trust on behalf of the Fund).

151. U.S. Bank was responsible for and controlled the preparation of the Fund's Registration Statements, the Shareholder Reports incorporated by reference, and the other Offering Materials, including with respect to securities valuation and calculation and publication of the Fund's NAVs, which were materially false and misleading.

152. By reason of the conduct alleged herein, U.S. Bank caused the Fund to issue false and misleading Registration Statements and other Offering Materials and to publish inaccurate NAVs in violation of § 11 of the Securities Act.

153. In addition, the Fund was a seller, offeror, and/or solicitor of the Fund's shares offered pursuant to the Offering Materials. By reason of the conduct alleged herein, U.S. Bank caused the Fund to prepare and disseminate false and misleading Offering Materials, and to offer

and sell shares to Plaintiff and the Class pursuant to those Offering Materials in violation of § 12(a)(2) of the Securities Act.

154. Plaintiff and the Class did not know, nor in the exercise of reasonable diligence could have known, of the falsehoods and omissions contained therein.

155. By reason of the conduct set forth above, U.S. Bank is liable as a control person pursuant to § 15 of the Securities Act and is jointly and severally liable to Plaintiff and the Class for the damages sustained as a result of the Fund's violations of §§ 11 and 12(a)(2) of the Securities Act, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

a. Determining that this action may be maintained as a class action pursuant to Wis. Stat. § 803.08 and appointing Plaintiff as the Class representative and undersigned counsel as Lead Counsel;

b. Determining that Defendant violated the Securities Act by reason of the acts and transactions alleged herein and requiring Defendant to pay damages sustained by Plaintiff and the Class;

c. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d. Awarding such other and further relief as this Court may deem just and proper.

Dated: July 22, 2022

**MALLERY sc**

*Electronically signed by K. Scott Wagner*
K. SCOTT WAGNER
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202-4697
Tel. (414) 727-6270
swagner@mallerysc.com

**MORRIS KANDINOV LLP**
AARON T. MORRIS
ANDREW W. ROBERTSON
1740 Broadway, 15th Floor
New York, NY 10019
Tel. (877) 216-1552
aaron@moka.law
andrew@moka.law

**MORRIS KANDINOV LLP**
LEONID KANDINOV
550 West B Street, 4th Floor
San Diego, CA 92101
Tel. (877) 216-1552
leo@moka.law

*Attorneys for Plaintiff Charles Sherck*

33